# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 18, 2012

## STATE OF TENNESSEE v. ROGER A. BEU, JR.

### Direct Appeal from the Criminal Court for Roane County
### No. 14095    Judge E. Eugene Eblen

---

### No. E2012-00176-CCA-R3-CD - Filed December 20, 2012

---

A Roane County jury convicted the Defendant, Roger A. Beu, Jr., of sexual battery by an authority figure. The trial court sentenced the Defendant to three years as a Range I, standard offender, at thirty percent, to serve thirty days in jail, with the balance on probation. On appeal, the Defendant contends: (1) the trial court erred when it denied his motion for new trial based on the prosecutor's improper comments to the jury during closing argument; (2) the trial court erred when it admitted into evidence the written statement of the victim; and (3) there is insufficient evidence to support his conviction. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Michael R. Giaimo (on appeal), Cookeville, Tennessee, and James A. H. Bell and John Barnes (at trial), Knoxville, Tennessee, for the appellant, Roger A. Beu, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Russell Johnson, District Attorney General; Bill Reedy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the Defendant's sexual encounter with the victim,[1] who was the Defendant's second cousin and fifteen years old at the time of the incident. For his actions, a Roane County grand jury indicted the Defendant for sexual battery by an authority figure. At trial, the parties presented the following evidence: B.N.,[2] the victim's mother, testified that she had two daughters, one, the victim, who was fifteen years old when the incident occurred in May 2008, and the other who was fourteen. She stated that her husband worked as a patrol officer with the "T.V.A. police." She explained that the Defendant was her husband's first cousin because the Defendant's parents are her husband's aunt and uncle. The Defendant, with his wife and children, moved from Colorado to Tennessee to care for the Defendant's elderly parents. B.N. stated that her family and the Defendant's family became "very close knit." The two families "spent a lot of time" together, especially during holidays. They also went camping and had "cook outs" together. B.N. stated that, during the months before the incident, the Defendant lived at his elderly parents' house during the week and stayed at his house with his wife and children on the weekends.

B.N. testified that, in May 2008, the Defendant asked the victim to work for him, as a "summer job," preparing a PowerPoint presentation for his parents' fiftieth wedding anniversary. B.N. stated that the Defendant had asked her and her husband for permission, stating that he would pay the victim "a little bit" to do the presentation. B.N. expected the victim's work on the presentation to take "a month or two because [the] anniversary was in July." The Defendant wanted the victim to scan photographs into the computer in order to create a PowerPoint slide show presentation for the anniversary party. B.N. testified that she had "no problem" leaving the victim with the Defendant because she "felt [the Defendant] was the authority figure" and "would oversee everything that she was doing and help her." B.N. testified that, up until that time, the Defendant had not "done anything" to make her "suspicious" about leaving her daughter with him.

B.N. stated that, on Tuesday, May 27, 2008, she took the victim to the Defendant's house at approximately 2:30 p.m. for the victim's first day of work on the project. When they arrived at the house, the Defendant was outside picking vegetables out of the garden, so B.N. spoke with him outside by the garden for fifteen or twenty minutes. Then, B.N. left the victim with the Defendant to work on the project while she went to run errands.

At approximately 5:30 p.m., B.N. returned to pick up the victim. At that time, the Defendant informed B.N. that he "forgot the scanner," so he and the victim did not get any

---

[1]To protect the identity of the minor victim, she will be referred to herein solely as "the victim."

[2]Because the victim was a minor at the time of the offense, the victim's mother and other members of the victim's immediate family will be referred to by their initials.

work done on the project that day. The Defendant, however, wanted the victim to return the next day to work on the project. B.N. explained to the Defendant that she would be unable to bring the victim back to his house until the afternoon of Thursday, May 29, 2008. The Defendant agreed to the victim returning Thursday to work on the project. B.N. testified that, after the victim and B.N. left the Defendant's house, she and the victim had a "mother/daughter chat." She stated that, as a result of the talk, "[the victim] said some things that [B.N.] was in question of." B.N. stated that, later that evening, they "ate din[n]er and watched T.V." and did "[n]ormal family evening things."

On Thursday, May 29, 2008, the Defendant called B.N. and asked her what time the victim could come over to scan pictures for the project. B.N. told him that she would bring the victim to the Defendant's parent's house around 2:30 p.m. B.N. testified that she and the victim arrived at the house at approximately 3:30 p.m. The Defendant had told B.N. to enter the house through the back door on the lower level of the house. The Defendant also told B.N. that he had not been feeling good that day, so he decided to leave work early. A woman named "Susie" had driven him to his parents house, where he was staying.

When B.N. and the victim arrived at the house, the Defendant asked B.N. to check his blood pressure. B.N. retrieved the Defendant's parents' blood pressure kit from upstairs, checked the Defendant's blood pressure, and determined it was 180/160. B.N. testified that she had "[f]irst aid and LPN training," so the Defendant's high blood pressure caused her concern. B.N. asked the Defendant if he had taken his blood pressure medication that day, and he responded that he had not because he left it at his house. B.N. offered to call the Defendant's wife, but the Defendant adamantly told B.N. not to call his wife. Despite the Defendant's wishes, B.N. walked outside to her car and called the Defendant's wife, who replied that the Defendant had not taken his blood pressure medication for six months. B.N. then told the Defendant's wife to call the Defendant's doctor and request that the doctor approve a transfer of the Defendant's prescription to a local Rite-Aid, so B.N. could pick up the medication and get it to the Defendant.

B.N. recounted that, while she was checking the Defendant's blood pressure, the victim was sitting at the bar in the kitchen eating some fast food that they had brought to the Defendant's house with them. B.N. said that, after she called the Defendant's wife, it took some time for the doctor to transfer the prescription. B.N. testified that she picked up the medication at 7:00 p.m. and then returned to the house. When she arrived, the Defendant was sitting in a recliner close to the door and the victim was sitting on the end of the couch across the room. The two were both watching a soccer game on TV.

B.N. said she informed the Defendant that she had his blood pressure medication. He asked her how she had gotten it, and she informed him that she had called his wife. The

3

Defendant "jump[ed] up," and said that he had told her not to call his wife. B.N. said she informed the Defendant that she was concerned about his blood pressure, and he sat back down. At that point, the victim, who appeared to be crying, "jumped up and went out the door."

B.N. testified that she gave the Defendant a pill, which he took. She told him she had to wait thirty minutes before she could take his blood pressure again. While the two waited, they continued watching the college women's soccer game on TV, and the Defendant commented on the players of the game, saying that they did not look like girls. The Defendant stood up and went into his bedroom. When the Defendant returned, B.N. took his blood pressure, and it had gone down to 140/90.

B.N. said that she discussed with the Defendant that they needed to retrieve his vehicle, because he left it by the interstate when "Susie" gave him a ride home earlier that day. She said both her daughters were with her, and she offered to take him to his car. The Defendant said that, after they got his car, he needed to return to work because he left his computer turned on and had some work to complete. B.N. told him that he should not do so and that he needed to rest. The Defendant disregarded her advice.

B.N. recalled that, when they got into her car to take the Defendant to his car, the victim was sitting behind her in the driver's side passenger seat. She was turned toward B.N., and she did not speak to the Defendant during the ride. B.N. said that they followed the Defendant to his office and waited while he was inside, so they could follow him home. When the Defendant came out of the office, he said that he would be fine and told them they did not have to follow him home. B.N. said, at that point, she got onto the interstate and headed toward the hospital because the victim's boyfriend had broken his arm.

B.N. testified that, when she returned to the Defendant's house after getting his medication, she learned that the victim and the Defendant were again unable to work on the project. B.N. testified that, on their way from the hospital, the victim told her something that had happened that day that disturbed her. B.N. said that, when she arrived home, she told her husband what the victim had told her. The victim, who was crying, also relayed to her father the events that she said happened earlier.

B.N. said she called the Sheriff's Department, and a male officer responded. Because a female officer was unavailable, the officer encouraged them to take photographs of their daughter. They did not allow her to shower. B.N. said that, on her daughter, were drawn pictures. There were pictures of stars drawn on her hips and a picture of the shape of a butterfly drawn on her buttocks. On her daughter's vagina were drawn the letters "B-G-L-S."

During cross-examination, B.N. identified photographs of the Defendant's parents' house and the room where he was staying. She said that she knew that the Defendant's wife had a new job, but she did not know that this was the reason the Defendant did not want her to call his wife. Regarding the first day she brought the victim to the Defendant's house, B.N. testified that she worked until 1:00 p.m. and then she brought the victim to the Defendant's parents' house. She said she picked her up around 4:00 or 5:00 p.m. She agreed that, before these allegations, she and her husband were good friends with the Defendant, and it was not unusual for him to come to their home or for them to talk on the phone. She agreed that, even after the victim made these allegations, the Defendant came to their home on several occasions, but she did not answer the door. The Defendant also called her on the telephone, but she did not speak to him.

B.N. testified that, several days before this incident, she and her husband had grounded the victim and restricted her use of her cell phone. Also, as part of the victim's punishment, they had told her that she was not allowed to go to Dollywood with her best friend, as she had planned.

B.N. said that she first learned of the victim's allegations from the victim's boyfriend. She explained that the victim went outside the Defendant's parents' house to call her boyfriend after B.N. told the victim that her boyfriend had broken his arm. At that time, the victim told her boyfriend what had happened. When B.N. saw the victim's boyfriend at the hospital later that evening, the victim's boyfriend told her about the allegations. B.N. questioned the victim on the way home from the hospital, and the victim reluctantly told her what had happened. The victim's boyfriend also called and informed the victim's father about these allegations.

The victim testified that, at the time of trial, she was eighteen years old and still living with her mother, B.N., her father, and her younger sister. She said that, at the time, she was a senior in high school and participated on the track, basketball, and soccer teams. She also played soccer for a travel and an international team. The victim testified that, before this incident, her family was very close with the Defendant's family and that they spent most weekends together.

The victim said that, when she was fifteen, the Defendant spoke with the victim's father about a summer job for the victim. The Defendant said he would pay the victim minimum wage to scan pictures for her great aunt and uncle's 50th wedding anniversary. The victim said she was excited about this opportunity because, she "was 15 and about to turn 16 and get my license and I needed gas money." Further, she said she was familiar with computers and felt confident she could do the task.

5

The victim recalled that the first time that she went to the Defendant's house to work was Tuesday, May 27, a week before the incident involved in this case. Her mother picked her up from basketball practice and brought her to the Defendant's house. When they arrived, the Defendant was in his vegetable garden. He went inside with the victim and B.N., and they had "casual conversation" until B.N. left about thirty minutes later.

The victim said that, after her mother left, the Defendant went into the kitchen to prepare something to eat. He asked her if she wanted anything, and she said "no" she was "fine." The Defendant said "well you're so skinny are you sure you don't want anything to eat?" The victim said she made a joke about how she could go days without eating, and the Defendant continued to make comments about how she was "so skinny" and "so ripped." The victim said she explained that she participated in so many sports that it kept her in shape. The Defendant said, "raise your shirt up for me." The victim said she said "what?" and the Defendant told her to raise her shirt up for him. The victim said she told the Defendant "no" and he said "yeah, just a little." The victim said she raised it up a small amount, and the Defendant ran his finger across her stomach.

The victim testified that the Defendant asked her what kind of exercises she did to maintain her physique. He then said he knew a "bunch of different types of crunches" that would make her more fit. The Defendant told the victim, who was wearing sagging basketball shorts and a T-shirt, that she looked "like a butch." The victim said she commented "I guess I do" because her clothing was a little big for her.

The victim said, after this conversation, the two went downstairs, and the Defendant began telling her about workouts, and he lay down on the floor. She asked him why he was on the floor, and he said he was going to show her some workouts. The victim said she got on the floor with him, and she began to do the crunches he showed her. The Defendant then put a pillow under her back and said, "[N]ow do you feel it." The victim said that she told him that she did, and he put his hands on her sides and said "do you feel it here?"

The victim said that, shortly after this, she got up and sat on the couch. She asked the Defendant about the work that she was supposed to do for him, and he told her that he did not have the printer or the other items necessary for her to work. The two talked together "normally," and the victim asked the Defendant if he would call her mother to come and get her. He called B.N. shortly thereafter.

The victim said she did not go to the Defendant's house that Wednesday because her sister had a cheerleading competition. On Thursday, the Defendant called B.N. and asked if the victim was going to come to his house to work. The victim said that B.N. picked her up from home, took her to Sonic to get something to eat, and then took her to the Defendant's

6

house. When they arrived, the Defendant appeared sick.

The victim confirmed her mother's testimony about the events that occurred shortly after they arrived. She added that, while B.N. was taking the Defendant's blood pressure, the victim sat down to eat her dinner while she wrote a note to her boyfriend. The victim said that B.N. left to go get the Defendant's blood pressure medicine, and asked the victim to watch the Defendant. The victim said that, ten minutes after her mother left, the Defendant leaned up on the couch where he had been lying and asked her what she was doing. She told him that she was eating, and the Defendant went back to sleep. The victim said, after she finished writing her note, she put the note in her pocket, and finished eating. She then put all her trash in a bag and walked to the back bedroom where there was a computer, intending to play computer games.

The victim testified that she began playing solitaire on the computer. She said she did not lean back in the computer chair because the Defendant's shirt was hanging on the back of the chair. After about ten minutes, the Defendant, who she thought was sleeping, "grabbed [her] shoulder" and asked "what are you doing in here?" The victim said she was "startled" because she did not know he was awake. She explained that she was playing solitaire, and the Defendant said that he could have moved his shirt for her if she had asked him. The victim said she told him the shirt was not bothering her. The Defendant removed his shirt anyway and put it in his closet. The victim said she asked if they were going to work on the project, and the Defendant said that they could not because he did not have the right scanner.

The victim said that the Defendant then said to her, "I know how to make you look like a real butch," and the victim said, "[W]hat?" The Defendant repeated himself, and told her to put on a pair of his khaki pants. The victim said she "play[ed] along" with the Defendant and, after he left the room, she put on his pants. She said, as she was putting on his pants, she thought she saw him looking through the hinges of the door at her. She said she felt "awkward[]," but she opened the door and made a joke about the pants, which were way too big. The Defendant "grabbed the front belt loops" of the pants and held the pants completely opened and looked down her pants. She said he kept trying to pull the pants back, and she finally jerked them away from him. The Defendant then went to his closet and retrieved a white collared shirt, saying he was going to make her look like "even more of a butch." He told her to "lose the blue" shirt she was wearing and to put on the white shirt. The victim said she told the Defendant no, but he mentioned she had a sports bra on and that she should change. The victim said she waited for the Defendant to leave the room, but he never did. The victim said she was "scared honestly because she didn't know what to expect."

The victim testified that she held one hand on her hip trying to hold the pants up and trying to take off her shirt at the same time. The Defendant "grabbed [her] pants and held them open and [she] tried to pull them back again and he held them for her." The victim said, finally, she just took off the shirt and put on the white shirt. As she did, the Defendant dropped the pants, and the victim had to grab them quickly before they hit the ground.

The victim said that, as she grabbed the pants and held them, the Defendant tied up her shirt in the front under her sports bra. He told her that now she looked like a "real butch," and he placed his hand on her back directing her toward the bathroom. The Defendant then said, "[T]here's something to make you look even more butch." The victim said she agreed, and she said "I guess pop my collar." The Defendant said, "yeah, pop your collar." The Defendant then told the victim to go back into the bedroom. The victim said she was standing in the room still in the Defendant's clothes when he asked her if she wanted a tattoo. She said, yes, when she got older, and the Defendant asked her what kind she wanted. The victim explained that she wanted stars on her hips and something on her back.

The victim testified that the Defendant reached for a pen, made sure it worked, and then asked her where she wanted her tattoos. She said he asked her if she wanted the stars on her "inner hips" or her "outer hips." The victim told the Defendant that she wanted her real tattoos on her "inner hips" but she was not sure. The victim said the Defendant leaned down and drew a star on her left hip and then he said "there." The victim told the Defendant "yeah, it's cute." The Defendant then told her to lay on the bed face down. He said "step on into Roger's Tattoo Parlor," and the victim laid on the bed. The Defendant kept pulling the pants farther and farther down, and he said "these things are always in the way." He pulled the pants down to her panty line on her back and started drawing. He then said the pants were getting in the way, and he "jerked the pants off." The victim said, at this point, she was laying on the bed face down with only her panties on.

The victim said she kept feeling the pen go "lower and lower" and that the Defendant kept lowering her panties. He made the comment that he was drawing a butterfly. The victim said her face was in the pillow and she was "shaking and . . . starting to cry." The victim said she felt the Defendant's drawing "half way down [her] backside." The next thing she knew, the Defendant told her that the back was done and told her to turn over. She complied with his request, and he told her to cover her face. The victim said she was crying and told him "no." He again told her to cover her face, so she placed her hands over her face. The Defendant told her that that was not good enough, and he threw his khaki pants over her face and hands, which were still covering her face. The victim said she was "crying" and "shaking."

The victim testified that the Defendant told her that he was going to draw the letters

8

B-G-L-S. She asked him what it meant, and he told her it meant "Bad Girl Lesbian Slave." The Defendant explained that the "bad girl" was because of her past, and she told him that her past had nothing to do with this. The Defendant then told her the "lesbian" part was because she looked like "a butch." The victim said she did not say anything, and the Defendant then told her that the "slave" was because she was his "little work slave." The Defendant drew these letters across her lower stomach towards her private area. The victim said she continued to cry, and the Defendant told her that it was "okay" and that he was "not going to hurt [her]." The Defendant kept lowering her panties to draw and then he jerked them completely off of her. The victim said that she jumped off the bed on the opposite side, and the Defendant reached for her. He said it was "okay," and the victim told him "no," that it was too weird and that she was scared.

The victim said the Defendant unlocked the door, and she grabbed her clothes, put on her panties, and went toward the bathroom, shutting the door behind her. The Defendant opened the door and said "it's okay," and then told her to sit on the counter and lean back against the mirror. The victim told the Defendant "no," but the Defendant kept moving closer, so she got up on the counter. The victim said she was sitting there, and the Defendant put his body on her knees so she could not go anywhere as she was pinned against the bathroom wall.

The victim testified that the Defendant shut the door, started talking, and started moving her panties down to mid-thigh. He then began drawing with the pen, this time on her "private area." The victim said the Defendant had his right hand touching her vagina and his left hand on the inside of her thigh. The victim said she was crying and shaking and asked him to stop. He told her that, "technically" he was not her uncle but was her second cousin. The victim said she kept crying and that all she "could do was look at the ceiling." The Defendant told her to put her hand on his shoulder, and then he placed her hand on his shoulder. She said she tried to move her hand but he had his arm blocking it. The victim said she continued crying and "begging" the Defendant to stop. The victim said she was eventually able to pull up her underwear, and she was sitting on the counter crying. The Defendant told her that he would "finish" when she was "not being so scared." The Defendant picked her up off the counter and set her down. The victim said she grabbed her clothing again, opened the door, walked back in the bedroom, and changed into her clothes.

The victim said she sat down at the computer and began listening to music. The Defendant asked her if everything was okay, and she said yes. The victim said the Defendant then heard someone talking, and he said, "I think someone's here." The Defendant went into the bathroom, and she heard running water. The Defendant then came back into the room, turned off the light, and wiped her back and across her hips with a wet rag, saying he did not want anyone to know. The Defendant told the victim that this was their "little secret," and

9

he shut the door.

The victim said she heard the Defendant talking to another man, Steven Collins, who was a friend of the Defendant's family. She heard Collins ask who was in there, and the Defendant responded that it was just his niece and that the two were doing some work. The victim said that, shortly thereafter, the Defendant returned, turned the light on, and laid across the bed. He asked the victim to come onto the bed so that they could talk. The victim initially refused, but then she went and sat on the "very end corner" of the bed. The Defendant "kept scooting closer" to her and, every time that he did, the victim scooted further away. The Defendant then asked her again if everything was okay, and he said, "I bet that's not the craziest thing you've done all week."

The victim testified that the Defendant then started talking about dominatrixes, women who give men pain for their pleasure. The Defendant asked the victim if she would be the submissive type or the aggressive type. The victim said she did not respond. The Defendant said he thought she would be the aggressive type because she played so many sports. The victim again did not respond. The Defendant turned the conversation toward piercing, and he began saying how men and women pierced their private areas to give each other more pleasure. The victim said she "just sat there." The Defendant then asked the victim if she and her boyfriend had engaged in sex, and the victim responded that they had not. The Defendant asked if the two had done "oral things," and the victim asked "like what?" The Defendant asked if they had "fingered each other" or used their mouths on each other. The victim responded that, no, they did not do that.

The victim testified that the Defendant told her that her boyfriend did not love her and that her boyfriend only wanted "to - - [her]." The victim told the Defendant that her boyfriend had nothing to do with this. The Defendant told the victim that there was no way that her boyfriend would love her "like this," and the victim responded that her boyfriend did love her. The Defendant said repeatedly that, no, he did not, and that he just wanted to "- - her." The victim said she started to "break down and cry," and she could not talk about it any more.

The victim said the Defendant then told her that he was having back pain, and he asked her to massage his back. The victim complied, and the Defendant said that if she heard him "moan and chirp" it was because he liked it. The victim said she rubbed his back for a short period and asked if that was good enough, and the Defendant said "oh yeah, that's good." The victim stopped rubbing his back, and the Defendant said, "oh, I meant like it felt good." The victim said she went to sit back in the chair near the computer desk. The Defendant, at this point, heard someone again and said, "I hope it's not Jan [his neighbor], she just comes in here and sits and talks the whole time." The Defendant turned off the lights

10

and told the victim to be quiet. Jan came in to feed the dogs, and the victim said she kept making a "coughing noise," so someone would hear her. The Defendant repeatedly told the victim to be quiet.

Jan left, and the Defendant turned the lights back on and left the room. The victim said she was "still crying because everything was just so awkward and [she] was scared because [she] didn't know what to expect." At some point, while she was sitting in the chair at the desk, the Defendant asked her if she shaved her private areas, and the victim said she did not respond. He said, "by the looks of it, it looks like you do." He then asked her if she shaved with an electric razor, and the victim eventually responded that she shaved with a regular razor, she "guess[ed]." The Defendant said that it looked like a regular one because it looked so "painful" and he offered to shave the area for her. The victim said she did not respond.

The Defendant went to the main room and turned on the television and asked her to check his blood pressure. The victim said she had to bend over in order to plug in the blood pressure cuff, and, as she did, the Defendant made an "ummmmmm" noise. The victim said she gave the Defendant an angry look, placed the cuff on his arm, pressed the button and walked away. The Defendant then turned on the television and started talking about soccer. He told the victim he wanted to ask her a question, and he began talking about how athletes pose for nude calendars to make money. The Defendant then said, "I bet you would look good in a nude calendar." The victim said she just walked back into the other room and asked the Defendant to call her mom.

The victim said she gathered all of her things, threw away her trash from dinner, and sat down on the far end of the couch waiting for her mother to come. The Defendant, she said, kept talking about the girls who were playing soccer on television, saying how they were "so built." The victim said that, as soon as her mother arrived, she ran outside to the car and borrowed her sister's cell phone to call her boyfriend. After he repeatedly asked her what was wrong, she told him what had happened without giving him all of the details. Her boyfriend told her that he was calling her father.

The victim said that her boyfriend called her father, told him what had happened, and then called her and told her that she needed to also tell her mom what had happened. The victim told her boyfriend she did not want to go back into the house where her mother was still with the Defendant. The victim's boyfriend informed her that he had broken his arm and was at the hospital. The victim said she went back into the house and told B.N. that they had to leave, asking if they could go to the hospital. B.N. agreed to take her there, and came outside. The Defendant came with her mother and offered to go with them to the hospital. B.N. told the Defendant she would take him to his car. The victim said that, during the ride,

the Defendant kept turning around and speaking to her, inquiring about her basketball schedule. She said she handed him a copy of her schedule. The victim said she did not make eye contact with the Defendant and instead looked out the car window.

The victim testified that they dropped the Defendant off at his car and then went to the hospital. Her boyfriend was still outside the ER, having not yet been seen by doctors. He asked her if she had told her mother, and she said "no" and asked him not to worry. The victim said she waited while doctors put her boyfriend's arm in a cast and a sling. When he came out of the hospital, the victim was speaking to her father and uncle, and the victim's boyfriend took the victim's mother aside and told her that she had to talk to the victim because something had happened to her. The victim's boyfriend briefly told her mother what had happened, and the two called the victim over to talk with them. B.N. asked the victim if her boyfriend's story was accurate, and the victim, who was crying again, said "yes." She then lifted her shirt and showed her the drawings, and B.N. began crying also.

The victim said that, on the way home from the hospital, she told her mother about the Defendant's actions, and her mother said she must tell her father. The victim said, after she arrived home, she did not want to speak to her father because she was upset. After some coaxing, she told her father the whole story. Her father began crying and went to his room and got his gun. They both encouraged him not to use his gun, and he said they had to call the police. The victim asked if she could shower, and her father said not to until they had spoken with police. The officer arrived, and because he was male, he asked the victim's parents to take photographs of the places on her body upon which the Defendant had drawn. The victim then gave a statement to the officer. The photographs were admitted into evidence and shown to the jury.

During cross-examination, the victim agreed that she had told her story multiple times, including to her parents, a police officer, a DCS worker, and also to the State's attorney, and she agreed that she was "prepared" to give her testimony. The victim agreed that the Defendant was of "wide girth." The victim also agreed that the Defendant's blood pressure was so high when they arrived that B.N. went to get him his medicine and that it was during the time that she was gone that these events occurred. She confirmed that she had testified that the Defendant picked her up off the bathroom counter at one point during this encounter.

The victim agreed that the police officer investigating this case did not refer her to a detective, take her to the hospital for photographs to be taken, or ask EMS to come and evaluate her. The victim testified that she did not give police officers any items of her clothing and that she did not have the pen that the Defendant used to write on her. She agreed that the officer never asked her for her cell phone records or the cell phone records

12

of her parents, sister, or boyfriend.

The victim agreed that she had lied to her parents before. On one such occasion, she had snuck out of the house and broken a window when she tried to re-enter the house undetected. She called the police and lied, telling them that there had been a burglary. The victim agreed she maintained this story until she was confronted with forensic evidence to the contrary.

The victim agreed that the day that these events took place she had planned to go to Dollywood with her friend from Japan before her friend returned to Japan. She denied that her parents denied her permission to go as a punishment and said, instead, she decided to stay and work for the Defendant because she wanted the money.

The victim agreed that, in her videotaped interview with DCS, she said that she felt like she looked like a lesbian and "butchy" when she went to the Defendant's house. She also told DCS during that interview that she did not want the Defendant to wash off the writing because she thought it would help people believe her and know that what she was saying was not a lie.

During redirect examination, the victim explained that the sneaking out of her house incident occurred almost two years before this incident. She said that her father was home when she left, and the door was unlocked, but that he left and locked the door before she returned. She accidently broke her window when she snuck back into her house. She said that she told her mother that someone had broken into the house. A few months passed and her "guilt got to her," and she told her parents the truth.

Based upon this evidence, the jury convicted the Defendant of sexual battery by an authority figure.

## II. Analysis

On appeal, the Defendant contends: (1) the trial court erred when it denied his motion for new trial based on the prosecutor's improper comments to the jury during closing argument; (2) the trial court erred when it admitted into evidence the written statement of the victim; and (3) there is insufficient evidence to support his conviction.

### A. Prosecutorial Misconduct

The Defendant contends that the prosecutor engaged in prosecutorial misconduct during closing arguments. The Defendant points to six instances that he alleges are

misconduct. The State contends that the Defendant has waived five of the six of these instances by failing to include them in his motion for new trial. The other comment, the State asserts, did not amount to prosecutorial misconduct.

In his motion for new trial, the Defendant asserts that his "due process rights were violated by improper and impermissible argument of the State that repeatedly sought to shift the burden of proof away from the State and onto the [D]efendant." In the memorandum supporting the motion, the Defendant noted several, but not all, of the statements by the prosecutor to which he now objects. As will be discussed below, the Defendant contemporaneously objected to all but one of the arguments made by the prosecutor that he now raises on appeal. We conclude that the Defendant sufficiently preserved for our review the statements made by the prosecutor.

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823); *see Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). This Court has explained that "closing arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

In *Goltz*, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton,* 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State,* 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); TENN. CODE OF PROF'L RESPONSIBILITY DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See [State v.] Cauthern,* 967 S.W.2d [726,] 737 (1998); *State v. Stephenson,* 878 S.W.2d 530, 541 (Tenn. 1994).

14

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern,* 967 S.W.2d at 737; *State v. Keen,* 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz,* 111 S.W.3d at 6 (quoting STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). When an appellate court determines an argument to be improper, "the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Goltz*, 111 S.W.3d at 5-6 (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

### 1. Comments on Lack of Defense Proof

Two of the prosecutor's comments about which the Defendant complains reference the Defendant's failure to offer or contest the State's witnesses' testimony. In the first statement, the State said:

Neither [B.N.] or [the victim] had the slightest thought that [the Defendant] would violate her daughter. That she was putting her daughter in harm's way to take her over there that fateful Tuesday and more fateful Thursday. So the

15

furthest thing from their mind. And we have not heard anything to controvert that.

The defense attorney objected to this comment and moved to strike it. The prosecutor withdrew the comment. Later, the prosecutor stated, "When you – when you don't have a defense you got to come up with something." The defense attorney objected, and the prosecutor said that this was just his opinion. He said that the defense attorney had been very resourceful, and the defense attorney reminded the trial court that he was not on trial. The prosecutor said, "Well, how many times did you hollar at me a few minutes ago." The prosecutor then said, "Excuse me, I'm sorry, I take it back."

This Court has previously held that a prosecutor's comments during closing argument regarding lack of defense proof and the fact that there was no evidence to contradict the State's case did not violate the defendants' right to remain silent, where there was no direct comment about the defendants' decision not to testify or any gross improprieties. *State v. Copeland,* 983 S.W.2d 703, 707 (Tenn. Crim. App. 1998). In another case, we stated, "The fact that the proof is uncontradicted may be commented on. . . . A more direct reference to the defendant not testifying might result in a mistrial, but in this instance that's not necessary." *See, e.g., State v. Livingston*, 607 S.W.2d 489, 492 (Tenn. Crim. App. 1980) (prosecutor's comment that no proof whatsoever was presented by the defendant was not a comment on the defendant's failure to testify). In *Copeland*, we noted, however, that

> Remarks which skirt the edges of impermissible comment are neither desirable nor worth the risk of reversal of what may well be a thoroughly deserved conviction. Caution is desirable until the constitutional boundaries of permissible comment on the state of the evidence when the accused does not testify are thoroughly established. In the meantime the sensible course is to assume that jurors can see as well as hear, and do not have to be told when evidence is uncontradicted.

*Copeland*, 983 S.W.3d at 707 (citing *Taylor v. State*, 582 S.W.2d 98, 101 (Tenn. Crim. App. 1979) (quotations omitted)).

We conclude in this case that the prosecutor's comments did not rise to the level of prosecutorial misconduct. Further, after making each of these two comments, the defense attorney objected, and the prosecutor withdrew or "took back" the comment. The trial court gave the jury a complete and proper instruction regarding its role when considering the arguments of counsel. The trial court instructed the jury, "The statements, arguments, and remarks of the attorneys are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not

16

supported by the evidence, they should be disregarded." Juries are presumed to follow the trial court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006). Under these circumstances, there is no basis to conclude that the prosecutor's statements rise to the level of reversible error.

## 2. Comments on Defense Attorney's Cross-Examination

The Defendant next contends that the prosecutor's comments about the victim being attacked by the defense attorney during cross-examination was prosecutorial misconduct. The prosecutor commented as follows:

> [y]ou are not going to find any inconsistencies that make a difference in this case. And this was two years ago, three years ago. And she didn't see [her written statement] again until, in preparation for this trial, I gave her a copy in fairness so she could see and read again what she wrote. And to do less and to put a 15 year old girl up here and let her be attacked by [the Defendant's attorney] or cross examined by [the Defendant's attorney] I would should say –

The defense attorney objected to the term "attacked," and the State's attorney apologized and said, "I took it back."

We conclude that the prosecutor's correction of his use of the word "attacked," by immediately correcting himself and stating "cross examined" cured what error, if any, existed. Further, we again note that the jury was instructed that the arguments of counsel are not evidence. Juries are presumed to follow the trial court's instructions. *Young*, 196 S.W.3d at 111.

## 3. Comment on Lawyer's Dreams

The next statement to which the Defendant objects was the prosecutor's statement about the fact that law enforcement did not conduct forensic testing in this case. The prosecutor stated:

> DNA – going to the crime lab in Nashville and having the tax payers pay for that. What issue would DNA resolve? Been a waste of tax payers money; is that what you want us to do? Just chase defense lawyer dreams about what should have been done?

The defense attorney objected to "defense lawyers dreams," and the prosecutor said, "Excuse

17

me." The trial court sustained the objection, and asked the prosecutor to rephrase the statement.

The comment by the prosecution appears to have been a response to the argument of defense counsel that law enforcement did not, but should have, conducted forensic testing in this case. This argument, while perhaps inartfully made, was not improper. Further, the Defendant has failed to demonstrate how the comment affected the jury verdict.

### 4. Comments Outside Scope of Trial

The Defendant next contends that the prosecutor committed prosecutorial misconduct when he made comments that were outside the scope of the guilt or innocence of the Defendant. The prosecutor stated:

> This is – this is probably going to sound kind of cold to some of you. And it may be even offensive to a couple of you or more. But having been in the trenches for a few years, quite frankly folks, I would rather try a cold blooded murder case than – any day, than one of these. And the reason why these cases are so hard to convict is that all of the costs are in the hand of offender, the sex offender. And most often these are intelligent people with problems. They got to plan where it happens –

The defense attorney objected saying, "[T]hey ain't on trial, [the Defendant] is [on] trial." The prosecutor then stated:

> Well, if you believe [the Defendant] was the sex offender in this case, he got to plan where it happened, where it happened and to whom it happened. He chose a victim that was vulnerable, he thought nobody would believe and he did it at a time that he would not be interrupted, in a place when he would not be interrupted. It was all very carefully executed. And just kind of blew up.
>
> The other – the other advantage that the perpetrator has in a case like this is that they're faceless. There is no profile for sex offenders. That's why I objected - remember to what [the defense attorney] said in voir dire, he said to you folks; . . . look like a pervert. Object. And the reason I objected is there are no profiles for perverts. Lord have mercy folks, we all out there in the public domain, at least reading about the public domain in different jurisdictions and [the] kind of people that commit these crimes. Some of them wear the collars of the priesthood, church robes, business suits, drive expensive cars, could be the guy next door. Our office just got a case –

18

The defense attorney objected saying that this was getting "away from [the Defendant's] case" and was not relevant. The trial court sustained the objection.

The comments to which the Defendant objects were objected to during the closing arguments. The trial court sustained the Defendant's objection, and the jury never heard further about the case the prosecutor's office had just received. We conclude that no improper argument was presented to the jury.

### 5. Comment on Victim's Statement

The final statement objected to by the Defendant was:

> [i]nstead of talking about the proof, instead of talking about the evidence, you know, example: well this thing, this 10 page statement is just riddled with inconsistency. He didn't point any of them out to you. Try it yourself, read it again, I challenge you, read it, it speaks for itself much better than I can, much better than he can. It will be there for you if you want to. I'm not going to waste any more time on it.
>
> I'm sick to death [of]. . . hearing about these inconsistencies that don't exist. This girl's rock solid in terms of her memory of what happened to her. She was victimized. She continued, and her mother as well, to be victimized on the stand yesterday. What do you think these people get out of this. This happened three years ago. They've been living with this prospect of coming to trial for that period of time and I have to apologize for that. Unfortunately that's the system that we have to work with.
>
> Oh yes, [defense attorney], I wish we had a perfect world here in Roane County, Tennessee, where the government just threw all kinds of money at the Roane County Sheriff's Department. And we could just take every dream you had about law enforcement and follow it up.
>
> So when you don't want to talk about the proof, you don't want to talk about what's really in there, you don't want to talk about – come on folks, these things don't lie. They do not lie.

The Defendant did not object to this statement. By failing to object to this statement at trial, the Defendant has risked waiving the issue on appeal. *Banks*, 271 S.W.3d at 132.

Further, if not waived, we conclude that the Defendant is not entitled to any relief

based upon these comments by the prosecutor. The prosecutor was responding directly to the defense attorney's statement in closing argument that the victim's statement was inconsistent. We conclude that the prosecutor's statements fall within the realm of permissible argument.

## B. Victim's Written Statement

The Defendant next contends that the trial court erred when it admitted into evidence the victim's written statement. The Defendant contends that the statement, which is ten pages long and signed by the victim's father, was not used to impeach her to a great extent. The State counters that the Defendant waived this issue by failing to object at trial to the admission of the statement as a prior consistent statement. Further, the State asserts that any error is harmless.

The State is correct that this Court has stated that a trial court "cannot be put in error on grounds raised for the first time on appeal when the objection at trial was based on another ground which was declared insufficient." *State v. Brock*, 678 S.W.2d 486, 490 (Tenn. Crim. App. 1984); *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Because, however, the Defendant argued in his motion for new trial that the trial court erred in allowing the victim's prior consistent statement, and failing to offer a limiting instruction, we will address this issue on its merits.

At trial, the Defendant's attorney impeached the victim using her statement and another statement she gave to DCS, playing portions of the videotaped interview for the jury. The Defendant's attorney implied that the victim had made up this story because she was mad at her parents for not allowing her to go to Dollywood. Further, the Defendant's attorney said that she knew people would not believe her because she had lied in the past. The State then sought to introduce the victim's written statement and the entire DCS interview to rehabilitate her. The Defendant's attorney objected, saying that he had not "open[ed] the door" to the admission of the victim's written statement and the entire videotaped interview. The trial court ruled that the videotaped interview was not admissible but that the State could introduce the written statement.

Generally, prior consistent statements are not admissible to bolster a witness's credibility. *State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998) (citing *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). However, three exceptions to this general rule exist. First, a "prior consistent statement may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made or when deliberate falsehood has been implied." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988).

20

In such a situation, a prior consistent statement is allowed to show that the trial testimony is consistent with what the witness said when no influence or motive to lie existed. *State v. Sutton*, 155 Tenn. 200, 204, 291 S.W. 1069, 1070 (1927). Second, a prior consistent statement may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness's testimony was either fabricated or based upon faulty recollection. *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). Moreover, "the impeaching attack which allows for corroboration may occur during cross-examination of the witness . . . . Under such circumstances, the [witness's] statement made before the inconsistent statement but which was consistent with his trial testimony" is admissible to rehabilitate the witness. *Id.* (citations omitted). Third, a prior consistent statement may be admissible when a witness's prior statement is used out of context to cross-examine the witness. *State v. Boyd*, 797 S.W.2d 589, 593-94 (Tenn. 1990).

We conclude that the victim's statement is admissible under either of the first two exceptions. First, the Defendant's attorney clearly implied that the victim had deliberately lied about the Defendant's interaction with her. Second, he argued that her recollection was faulty, noting that her statement differed from her trial testimony about whether the Defendant drove her home or her mother picked her up after the first time she was at the Defendant's house to work. Under these exceptions, the victim's statement was properly admissible to rehabilitate her.

To the extent that the Defendant argues that the trial court erred by failing to issue a limiting instruction on a prior consistent statement, he has waived that issue by not requesting the instruction at trial. *See State v. Joseph Shaw, Jr.*, No. W2009-02326-CCA-R3-CD, 2010 WL 3384988, at *7 (Tenn. Crim. App., at Jackson, Aug. 27, 2010), *perm. app. denied* (Tenn. Jan. 13, 2011). The Defendant is not entitled to relief on this issue.

### C. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence to sustain his conviction. Specifically, the Defendant asserts that sexual impropriety crimes in Tennessee should require physical corroboration. The Defendant acknowledges that Tennessee has no such requirement, but he states his desire that we change the current state of the law. The State counters, first, that no physical corroboration is required by law. Further, it contends that it proved beyond a reasonable doubt that the Defendant committed sexual battery by an authority figure by drawing on the victim's body on or near her vagina and on her buttocks.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable

21

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant

22

bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Tennessee Code Annotated section 39-13-527 provides:

Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by the following circumstances:

(1) The victim was, at the time of the alleged offense, thirteen (13) years of age or older but less than eighteen (18) years of age; [and] . . .

(3)(A) The defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact; . . . .

T.C.A. § 39-13-527 (2010). "Sexual contact" includes the intentional touching of the victim's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification. T.C.A. § 39-13-501(6) (2010). "Intimate parts" includes the primary genital area, groin, inner thigh, buttock or breast of a human being. T.C.A. § 39-13-501(2) (2010).

Based on the victim's testimony, together with all of the evidence presented at trial, we conclude that the Defendant's conduct meets the elements of the crime for which he was convicted. This Court has found that "the law does not require that the State corroborate the victim's testimony with medical proof that the offense was committed. . . . Moreover because the definition of sexual battery embodies 'touching,' physical evidence of contact is not a practical requirement." *State v. James Cleveland Breer*, No. W2001-00390-CCA-R3-CD, 2002 WL 1482796, at *6 (Tenn. Crim. App., at Jackson, Feb. 7, 2002), *perm. app. denied* (Tenn. July 8, 2002). Further, while physical corroboration is not a necessary element to this offense, we note that there was physical corroboration of the victim's testimony. The State offered photographs of the drawings that the victim said the Defendant made on her buttocks and the area near her vagina. These photographs confirm that there were, in fact, drawings in the areas testified to by the victim. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE